FILED

2026 Jul-09  AM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **YELLOWHAMMER ENERGY SOLUTIONS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:24-cv-1285-EGL** |
| | ) | |
| **MEGA HIGHWALL MINING LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff Yellowhammer Energy Solutions, LLC and Defendant Mega Highwall Mining, LLC entered into a mining agreement. Mega would use its highwall mining system at Yellowhammer's property, deliver the coal to Yellowhammer, and be paid per ton of coal produced. After a few months of mining, Mega terminated the contract for cause after Yellowhammer failed to pay several invoices by the deadline set in the contract. Two years later, Yellowhammer filed suit, alleging Mega breached the contract, and Mega counterclaimed, alleging that Yellowhammer had breached. Mega has moved for summary judgment on all of Yellowhammer's claims, as well as on Mega's counterclaim. Considering the motions, the evidentiary submissions, and after hearing oral argument, the Court finds that Mega's motion (Doc. 30) is due to be granted for the reasons below.

## BACKGROUND

Yellowhammer owned a leasehold interest in property located in Jefferson County, Alabama, and contracted with Mega to mine and remove coal from that property. Doc. 20 at ¶7. Michael Henderson, a Mega employee; Dave Canterbury, president of Mega; and Rodney Mays, owner and operator of Yellowhammer, were the main parties involved in the negotiations, contract execution, ensuing relationship, and conversations regarding performance under the contract. The contract has a date of April 21, 2022, *see* Doc. 31-7 at 1, but Mega contends that the fully executed contract was not returned to it until June 1, 2022, *see* Doc. 32 at 5.

Under the contract, Mega would provide the equipment, tools, and labor for a special kind of mining, "highwall mining," while Yellowhammer would prepare the general mine site and accept and pay for the coal mined by Mega. Doc. 31-7 at 2-4. Yellowhammer would pay $30 for each "Clean Ton Equivalent" (CTE). *Id.* at 5. The coal would be delivered from Sunday to Saturday each week, and the payment would be due on Friday of the following week. *Id.* Under Section 13(a)(ii), if Yellowhammer failed "to pay any amounts due to [Mega] within ten (10) days of its due date," Mega could terminate for cause. *Id.* at 9. The initial term of the contract was estimated at twelve months, *id.* at 4-5, and, outside of for-cause termination, either party could terminate before the end of that term by giving 90-day written notice. *Id.* at 9 (Section 13(d)).

Before the mining could begin, Mega had to move the equipment to the site, Doc. 32 at 5, and the parties contracted for Yellowhammer to pay $125,000, the "Mobilization Fee," to cover this cost, Doc. 31-7 at 5. The contract provided that after mining was complete, Mega would pay to "demobilize equipment," but with one exception. *Id.* If Yellowhammer defaulted under Section 13(a)—i.e., by failing to pay an amount within ten days of its due date—it would owe Mega a $100,000 demobilization fee. *Id.* at 9.

The relationship was rocky from the start. On April 21, 2022, Mega invoiced Yellowhammer $125,000 for the mobilization fee, but Yellowhammer paid only $100,000 on time and did not pay the rest of the fee until July 11, 2022. Doc. 31-11 at 2. The contract provided for a May 16, 2022 commencement date, but due to various issues—including the lack of a fully executed contract, *see* Doc. 32 at 6— mining did not begin until June 18, 2022, *id.* For about four months, Mega operated the highwall miner and delivered coal to Yellowhammer. Mega asserts that there were issues regarding Yellowhammer's preparation of the site, subsurface mining conditions, highwall availability, and other difficulties affecting coal production, *see id.* at 9-16, but those details are irrelevant to resolve this motion.

Over the four-month mining relationship, Yellowhammer was late on multiple payments. Doc. 31-11 at 2.[1] Yellowhammer paid a June 27 invoice seventeen days late, and two more invoices from August were paid over ten days past their due dates. *Id.* In July or August of 2022, Rodney Mays (Yellowhammer) and Dave Canterbury (Mega) had a phone call. The exact details of the conversation are not recalled by either party, but no one disputes the general substance of the conversation. Canterbury told Mays that Yellowhammer had to "catch up" on payments or Mega would have to terminate the contract.[2] *See* Doc. 31-1 at 12, 54; *see also* Doc. 32 at 23-24.

Mega sent an invoice on September 5, 2022, which Yellowhammer did not pay in full until September 21, 2022—twelve days past its due date. Doc. 31-11 at 2 (invoice due date of September 9). On September 22, 2022, Mega sent Yellowhammer a Notice of Termination, citing Section 13(a)(ii) and listing four invoices that were in default. Doc. 31-14 at 2. Two years later, Yellowhammer sued Mega for breach of contract, *see* Doc. 1; Doc. 20, and Mega brought a breach-of-contract counterclaim, *see* Doc. 22. Mega now moves for summary judgment on all three of Yellowhammer's claims and on Mega's counterclaim. Doc. 30.

---

[1] Yellowhammer does not dispute that this chart is an accurate representation of the invoices and payment dates.

[2] Mays said Canterbury said either "terminate" or "pull the machine." Doc. 31-1 at 54.

## STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "material" if it might affect the case's outcome. *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).

The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). The movant may discharge its burden by pointing out the absence of evidence supporting an essential element of the nonmovant's case. *Id.* at 325. The district court must draw all inferences and review the evidence in the light most favorable to the nonmovant. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant carries its initial burden, the nonmovant must come forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If a rational trier of fact could not find for the nonmovant, there is no genuine dispute for trial. *Id.* But all reasonable doubts are resolved in the nonmovant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

**DISCUSSION**

Yellowhammer raises three counts. First, Yellowhammer claims that Mega terminated the contract without cause pursuant to Section 13(d) and thus must return to Yellowhammer a pro rata portion of the mobilization fee. *See* Doc. 20 at ¶¶24-30. Second, Yellowhammer claims that the contract required Mega to produce at least 20,000 CTE per month; Mega did not, so it must compensate Yellowhammer for its shortfall in net profits. *See id.* at ¶¶31-37. Third, because Mega allegedly terminated pursuant to Section 13(d), Yellowhammer claims that Mega was required to give 90 days' notice before termination; Mega did not, so it must compensate Yellowhammer for its anticipated net profits on the 60,000 tons of coal that Mega was required to produce in those 90 days. *See id.* at ¶¶38-43.

Yellowhammer's claims and Mega's counterclaims raise two issues: (1) whether the contract required Mega to produce 20,000 CTE per month; and (2) whether Mega had waived its right to terminate for late payments under Section 13(a)(ii), meaning that Mega's termination was instead under Section 13(d).

The contract did not require Mega to produce 20,000 CTE, and Mega did not waive its right to terminate for late payments under Section 13(a)(ii). The Court will therefore **GRANT** summary judgment in Mega's favor on all counts.

## I.    Governing Law

The contract contains a choice-of-law provision selecting Kentucky law: "This Agreement and the rights, duties, obligations and remedies of the parties hereunder shall be governed and construed in accordance with the laws of the Commonwealth of Kentucky." Doc. 31-7 at 11. In its response, along with citing to Kentucky law, Yellowhammer cites both Georgia and Alabama cases but does not argue that the choice-of-law clause should not apply. *See generally* Doc. 35. Considering the choice-of-law provision and having no indication that the parties dispute the applicable law, the Court will apply Kentucky law to interpret the contract.

In its initial brief, Mega cited Kentucky common law as the relevant governing law, *see generally* Doc. 32, and in response, Yellowhammer cited both Kentucky law and Kentucky's version of the UCC, *see generally* Doc. 35. Yellowhammer made no argument as to why the contract should be governed by Kentucky's UCC as opposed to Kentucky common law. *See* Doc. 36 at 5. The Kentucky UCC applies to "transactions in goods," and applies to some extent to hybrid transactions. KY. REV. STAT. § 355.2-102(1)-(2). The Court finds no reason to apply Kentucky's UCC to the interpretation and application of this contract; it is not one for the sale of goods, nor is it a hybrid situation.

The contract concerns a service: Mega will mine the coal, deliver it to Yellowhammer, and get paid per ton of coal produced. *See generally* Doc. 31-7. The contract explicitly states that all coal mined by Mega will remain the property of Yellowhammer at all times. *Id.* at 6. While coal is a movable good, this contract does not concern the sale of that good—Mega never owns or sells the coal. The contract concerns only Mega's mining service, among other responsibilities of the parties. *See, e.g.*, *Wehr Constructors, Inc. v. Steel Fabricators, Inc.*, 769 S.W.2d 51, 54 (Ky. Ct. App. 1988) (holding that goods incorporated into a contract do not transform it into one for the sale of goods). Mega mines the coal and is compensated for each clean ton equivalent mined—i.e., for services provided. The contract therefore does not concern the sale of goods and Kentucky's UCC does not apply.

## II.    Counts I & III

To succeed on a breach of contract claim, Yellowhammer must show the existence of a valid contract, a breach of that contract, and damages flowing from the breach. *Loxodonta Aviation, LLC v. Delta Priv. Jets, LLC*, No. 19-cv-109, 2020 WL 4516829, at *3 (E.D. Ky. Aug. 5, 2020). The only element at issue for these claims is the second—whether Yellowhammer can show breach.

The contract has two relevant termination provisions. Section 13(d) allows either party to terminate at any time with 90-day notice. Doc. 31-7 at 9. Termination under this provision requires Mega to partially reimburse Yellowhammer for the

mobilization fee. *Id.* But under Section 13(a), Mega retained the power to terminate for cause, with no notice, and no reimbursement requirement, if Yellowhammer failed to pay any amount due within ten days of the due date. *Id.*

Mega expressly terminated pursuant to Section 13(a) based on Yellowhammer's failure to pay amounts due within ten days of the invoice due dates. *See* Doc. 31-14 at 2. Yellowhammer argues that Mega waived or modified that provision and lost its right to terminate for cause, which would mean that Mega actually terminated under Section 13(d) and breached the contract when it failed to return the mobilization fee (Count I) and failed to operate the mine for 90 additional days (Count III). *See generally* Docs. 20, 35. Mega moves for summary judgment on both claims, arguing that it permissibly terminated for cause pursuant to Section 13(a)(ii), and therefore did not breach the contract. Both counts raise the same issue: Did Mega terminate for cause under Section 13(a)(ii) or had it previously modified or waived that provision?

The Court finds that Yellowhammer has not created a genuine dispute of material fact over whether Mega modified or waived the provision. The Court thus concludes as a matter of law that Mega permissibly terminated the contract under Section 13(a)(ii). Mega's actions therefore did not constitute a breach, and the Court will **GRANT** summary judgment on both counts.

### 1. Modification

Yellowhammer uses the terms "modification" and "waiver" interchangeably in its response, *see generally* Doc. 35, but whether a contract has been modified requires distinct analysis from whether a party has waived a contractual requirement. Parties to a contract can orally modify certain contractual provisions even where, like here, the contract requires any modification to be in writing.[3] *See Francis v. Nami Res. Co.*, No. 04-cv-510, 2008 WL 852047 (E.D. Ky. Mar. 28, 2008); *see also Vinaird v. Bodkin's Adm'x*, 72 S.W.2d 707, 711 (Ky. 1934). To be enforceable, that modification must be supported by consideration. *See Vinaird*, 72 S.W.2d at 711; *Martin v. Pack's Inc.*, 358 S.W.3d 481, 484 (Ky. Ct. App. 2011). There is no evidence that Mega received consideration for the alleged modification of its contractual right to terminate. With no evidence of consideration, there can be no valid modification of a contractual provision, and Yellowhammer thus failed to show that Mega modified the contract.

### 2. Waiver

Mega expressly terminated the contract under Section 13(a)(ii) when Yellowhammer failed to pay an invoice within 10 days of its due date, Doc. 31-14 at

---

[3] "No amendment, alteration, modification or waiver of this Agreement shall be valid or enforceable unless in writing and duly executed by an officer of the party sought to be charged." Doc. 31-7 at 11.

2, but Yellowhammer argues that Mega waived its right to terminate under that provision, *see* Doc. 35.

Waiver is "an intentional relinquishment of a known right," which "may be express or it may be inferred from the acts or conduct of a party." *Bates v. Grain Dealers Nat'l Mut. Fire Ins. Co.*, 283 S.W.2d 3, 5 (Ky. 1955).[4] For example, waiver can be "inferred from a failure to insist upon recognition of the right or conformance with the condition." *Barker v. Stearns Coal & Lumber Co.*, 163 S.W.2d 466, 470 (Ky. 1942). But "waiver will not be inferred lightly." *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 344 (Ky. Ct. App. 2001). To find an implied waiver, there must be evidence of "a party's decisive, unequivocal conduct reasonably inferring the intent to waive," to the point that the party's "statements and supporting circumstances [are] equivalent to express waiver." *Kentucky Bluegrass Experience Resort v. Woodford Cnty. Bd. of Adjustments*, 731 S.W.3d 13, 22 (Ky. Ct. App. 2025) (quoting *Moore v. Asente*, 110 S.W.3d 336, 360 (Ky. 2003)).

There is no express waiver here, so the issue of implied waiver raises two related, but distinct questions. **(1)** Is there evidence that Mega waived the right to terminate the contract based on Yellowhammer's late payments on the June and August invoices? **(2)** Is there evidence that Mega waived Section 13(a)(ii) going

---

[4] In its response, Yellowhammer cites UCC provisions concerning waiver, course of performance, and course of dealing. *See generally* Doc. 35. As explained above, Kentucky's UCC does not apply to the interpretation of this contract.

11

forward and thus lost its right to terminate for Yellowhammer's subsequent failure to pay the September 5 invoice within 10 days of its due date?

Considering the first question, there is evidence that Mega waived its right to terminate based on June and August default invoices.[5] Mega sent a notice of termination based on four late invoices, one in June, two in August, and one in September. Doc. 31-14 at 2; Doc. 31-11 at 2. But, at the time of termination, Yellowhammer had previously paid the June and August invoices in full, and Mega continued to perform for several weeks after those late payments. This continued operation could support finding waiver of the right to terminate the contract for belated payment of those particular invoices.

Consider a similar situation with a lease agreement: When a lessor accepts rent with knowledge of a lessee's default, acceptance of the rent constitutes a waiver of that default. *See Allen v. Bates*, 498 S.W.2d 120, 122 (Ky. 1973). Similarly here, when Mega accepted the late payment with knowledge of Yellowhammer's default and continued operating the mine, it may have waived the right to cancel based on those defaults. *Cf. Clift v. RDP Co.*, 200 F. Supp. 3d 660, 672-73 (W.D. Ky. 2016) (holding that plaintiff waived right to terminate contract for breach that occurred over 15 years prior when it continued to perform under the contract). Thus, if Mega

---

[5] These invoices are dated 4/21/2022, 6/27/2022, 8/15/2022, 8/22/2022, and the invoice numbers are 4212022, 6272022, 8152022, 8222022. Doc. 31-11 at 2.

12

had terminated based on the June and August invoices alone, a jury could find that Mega breached the contract.

But Mega terminated on September 22, 2022, based on a September 5, 2022 invoice that was not fully paid until September 21, 2022. *See generally* Docs. 31-14, 31-11.[6] Yellowhammer paid this invoice twelve days past the due date, thereby triggering Mega's right to terminate under Section 13(a)(ii), and Mega sent a notice of termination the very next day.

The next question then is whether Mega's actions following late payments of the mobilization fee and the June and August invoices could support a finding of waiver of Mega's contractual right to timely payment and the right to terminate for any subsequent invoice that was over ten days past due. Yellowhammer argues that Mega's "consistent" acceptance of late payments is evidence of waiver of the entire contractual provision giving Mega the right to terminate for cause if "[Yellowhammer] fails to pay any amounts due to [Mega] within ten (10) days of its due date." Doc. 31-7 at 9 (Section 13(a)(ii)). Yellowhammer correctly notes that Mega accepted several late payments, but, critically, not every late payment triggered Mega's right to terminate the contract. Mega could terminate for cause only if Yellowhammer's payment was more than ten days overdue. *See* Doc. 31-7 at 9.

---

[6] Mega stated that it was terminating because invoice 09052022 was in default. *See* Doc. 31-14. Looking at the invoice chart, Mega sent the invoice on September 5, 2022, and Yellowhammer paid on September 21, 2022, twelve days past the due date. *See* Doc. 31-11 at 2.

13

While Yellowhammer tended to pay late, prior to the default triggering termination, Yellowhammer paid only four invoices outside of the crucial ten-day window. *See* Doc. 31-11 at 2. Those four invoices, out of the twelve total that preceded the September 5 invoice, do not show such consistent performance as to indicate Mega's intentional relinquishment of the right to terminate going forward. *Cf. Venters v. Watts*, 215 S.W.2d 953, 954 (Ky. 1948) (holding that party waived strict compliance with terms of the contract when it allowed non-conforming performance for six months of the contract). Mega will not be faulted for declining to terminate the first time Yellowhammer defaulted on a payment. *See Price v. First Fed. Sav. Bank*, 822 S.W.2d 422, 424 (Ky. Ct. App. 1992) (recognizing that if accepting mortgage payments would constitute a waiver of any right to accelerate and foreclose, a lender would never act with leniency for fear of being precluded from foreclosing at a later time); *see also Bailey v. Bailey*, 231 S.W.3d 793, 799 (Ky. Ct. App. 2007) ("Debra's failure to immediately move to enforce Ellis's compliance with the Separation Agreement cannot be seen as a waiver of her contractual rights.").

Yellowhammer relies on the phone call between Mays and Canterbury as evidence of waiver, *see* Doc. 35 at 23-24, but the only reasonable inference that can be drawn from the call is that Mega intended *to* terminate if Yellowhammer did not pay on time. Canterbury told Mays that if Yellowhammer did not catch up, Mega would have to terminate. *Id.* Mega was clearly aware of its right to terminate based

14

on late payments, and Mega informed Yellowhammer that it had not relinquished that right. The phone call shows Mega's intent to rely on Section 13(a)(ii), not waive its right to do so. *Cf. Kincaid v. Johnson, True & Guarnieri, LLP*, 538 S.W.3d 901, 915-16 (Ky. Ct. App. 2017) (finding waiver of right to timely payments based on consistent acceptance of late payments and explicit statement that company would "not insist on full payment").

Additionally, the contract's anti-waiver provision serves as further evidence that Mega did not intend to waive the termination provision. The contract provides: "No action or failure to act by [either party] shall constitute a waiver of any right afforded it hereunder, nor shall any such action or failure to act constitute an approval of or acquiescence in any breach hereof, except as may be specifically agreed in writing." Doc. 31-7 at 10. Most courts hold that anti-waiver provisions are not binding and parties can still waive compliance with certain provisions, but there is support for finding that the anti-waiver provision means what it says. *See, e.g.*, *Universal C.I.T. Credit Corp. v. Middlesboro Motor Sales, Inc.*, 424 S.W.2d 409, 411 (Ky. 1968); *Price*, 822 S.W.2d at 424; *Home Fin. Co. v. Frazier*, 380 S.W.2d 91, 93 (Ky. 1964) (finding anti-waiver provision valid and that parties "may validly agree that the acceptance of delayed payments shall not waive strict performance"); *Deane Mining, LLC v. Elk Horn Coal Co.*, 2021 WL 1932727, at *7 (Ky. Ct. App. May 14, 2021). Regardless, even if not binding, this provision further confirms that this case

15

is not one in which a party's "statements and supporting circumstances [are] equivalent to an express waiver." *Kentucky Bluegrass*, 731 S.W.3d at 22. The contract explicitly provides that Mega's failure to act—i.e., to terminate based on the first late payment—will not constitute waiver. *See* Doc. 31-7 at 10. This contractual provision tends to show that Mega did not intend to waive Section 13(a)(ii) when it allowed Yellowhammer to pay late four times before terminating based on the fifth late payment.

Based on these undisputed facts, the Court finds there is no genuine dispute of material fact and Yellowhammer's claims fail as a matter of law. Yellowhammer has not presented any evidence of Mega's "decisive, unequivocal conduct" or circumstances "equivalent to express waiver" that would imply the intent to waive. *Kentucky Bluegrass*, 731 S.W.3d at 22. The evidence confirms the opposite—that Mega did not waive its right to terminate under Section 13(a)(ii). *First*, the contract contains an anti-waiver provision, which even if not dispositive, shows Mega's intent not to waive. *Second*, the Court looks at the conduct between the parties. There is one invoice that Yellowhammer paid in full by the due date. Doc. 31-11 at 2. There are eight invoices that Yellowhammer paid within ten days of the due date. *Id.* And other than the invoice triggering termination, there are only four invoices that were in default. *Id. Third*, there is evidence of a phone call wherein Mega told Yellowhammer to catch up on payments or it would have to terminate. Considering

16

this record, no reasonable juror could conclude that Mega intended to waive its right to terminate and therefore no genuine dispute of fact remains. *See Hyatt Corp. of Delaware v. Young & Assocs., Inc.*, No. 2004-CA-2233 2005 WL 3004744, at *4 (Ky. Ct. App. Nov. 10, 2005) (explaining that if evidence is not sufficient to raise the question of intent, the right to go to a jury does not exist). Because Mega did not waive its right, it therefore permissibly terminated under Section 13(a)(ii) and the Court will **GRANT** summary judgment on Counts I and III.

## III.   Count II

In Count II, Yellowhammer alleges Mega breached the contract by failing to produce 20,000 clean ton equivalents (CTE) per month. Doc. 20 at ¶¶31-37. It is undisputed that Mega did not produce 20,000 CTE during any month of the contract, *see* Docs. 32, 35, however, Yellowhammer cannot prove a breach because the contract does not require Mega to produce a certain amount.

"[T]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003). The contract has three references to 20,000 CTE of coal. In the section describing Yellowhammer's responsibilities, the contract requires Yellowhammer to "prepare[] and construct[] the general mine site … so as to allow [Mega] the *opportunity* to produce a minimum 20,000 CTE per month." Doc. 31-7 at 3 (emphasis added). That section further requires

Yellowhammer to "provide bench and highwall for, and accept, at least 20,000 CTE per month for twelve (12) months." *Id.* These provisions do not require Mega to produce 20,000 CTE per month; indeed, these provisions only require action of Yellowhammer—not Mega. The contract also states: "It is understood and agreed that the amount of production contemplated by the parties is 20,000 CTE Tons per month or more, to be produced at a reasonably consistent level throughout the month to the extent practicable." *Id.* at 4. This provision, while noting that the parties "contemplate" the amount being 20,000 CTE per month, does not definitely require Mega to produce 20,000 CTE per month. In fact, the paragraph above this sentence describes that the parties were to meet every three months to update the "Mining Plan," which, "among other things, estimate[s] the amount of Coal to be produced each month." *Id.* If the parties are meeting every three months to estimate the amount of coal to be produced, it is unclear how the same contract requiring that meeting and estimation could also require Mega to produce a set amount each month, or risk being in breach.

The language of the contract is clear on this matter; nothing in the agreement requires Mega to produce 20,000 CTE per month. Therefore, Yellowhammer cannot prevail on this breach of contract claim and the Court will **GRANT** summary judgment as to Count II.

## IV.    Mega's Counterclaims

Mega asks the Court to grant summary judgment and award damages on its breach of contract counterclaim based on (1) Yellowhammer's failure to pay the $100,000 Demobilization fee; and (2) Yellowhammer's failure to pay Mega for all coal mined, including both unpaid invoices and un-invoiced coal. Doc. 32 at 35. For the reasons explained above, Mega permissibly terminated under Section 13(a)(ii), and summary judgment will be granted on this claim.

The contract provides: "In the event of default by [Yellowhammer] under Section 13(a) … [Yellowhammer] shall pay [Mega] a demobilization fee of $100,000.00." Doc. 31-7 at 9. The Court found that Yellowhammer defaulted under Section 13(a) when it failed to pay the September 5, 2022 invoice within ten days of its due date, and therefore, Yellowhammer must pay Mega the required fee. The Court will award Mega $100,000 in damages on this counterclaim.

As to the rest of the counterclaim and damages, Yellowhammer does not dispute that there are unpaid invoices and coal which has not been paid for. *See generally* Doc. 35. However, before awarding damages, the Court will require further briefing. Mega alleges, and supports with record evidence, that Yellowhammer owes $95,106.08 in unpaid invoices. Doc. 32 at 36. Yellowhammer must inform the Court as to whether it disputes this amount, and if it does, provide evidence supporting the dispute.

19

Mega further alleges that Yellowhammer owes $44,778 for coal mined but not invoiced. *Id.* Mega reviewed its production records and totaled the weighed coal at $31,278. *Id.* There was also coal left on the ground, which Yellowhammer estimated to be about 450 CTE, worth $13,500. *Id.* The parties are required to confer regarding amount of coal not yet invoiced, and how much it is worth. If the parties can agree, they shall submit a joint report to the Court with supporting evidence. If the parties cannot reach an agreement, they must each inform the Court as to the amount they allege damages to be, and support that amount with evidence.

## CONCLUSION

The Motion for Summary Judgment (Doc. 30) is **GRANTED**. The parties shall file the briefing described above regarding damages on or before July 30, 2026.

**DONE** and **ORDERED** this 9th day of July, 2026.

**EDMUND G. LACOUR JR.**
UNITED STATES DISTRICT JUDGE

20